*Lithko Contracting, LLC, et al. v. XL Insurance America, Inc.*, No. 31, September Term, 2023.

**CONTRACT INTERPRETATION – OBJECTIVE THEORY OF CONTRACT INTERPRETATION**

Maryland adheres to the objective theory of contract interpretation. Under that approach, unless the language of the contract is ambiguous, we interpret it based on what a reasonable person in the position of the parties would have understood the language to mean rather than the subjective intent of the parties at the time of formation. We do not interpret contractual language in a vacuum. Instead, we interpret that language in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution.

**CONTRACT INTERPRETATION – WAIVER OF SUBROGATION**

A commercial tenant and landlord entered into a general contract for the construction and subsequent lease of a warehouse in which the landlord would also act as the general contractor for the warehouse. That contract contained a waiver of subrogation in which the tenant and landlord waived subrogation against one another regarding claims for certain losses, including losses caused by their respective subcontractors. After the warehouse sustained weather damage, the tenant's insurer brought a subrogation action against the subcontractors to recoup insurance payments it made to the tenant. The Supreme Court determined that the plain language of the general contract did not show that the waiver of subrogation between the landlord and tenant was intended to benefit the subcontractors. Thus, the Court held that the subcontractors, who were not bargaining parties to the contract, are not third-party intended beneficiaries of the contract and may not enforce it. The contract also required the landlord to include in its subcontracts a different waiver of subrogation, the language of which suggested that it applied among multiple parties but also that the tenant was not included as a party to the waiver. The Court therefore held that the waiver in the subcontracts was ambiguous as to whether the subcontracts included a waiver of subrogation by the tenant against the subcontractors, which would preclude the tenant's insurer from bringing its action against the subcontractors. The Court therefore held that extrinsic evidence was needed to show the subjective intent of the parties regarding the scope of the subrogation waiver.

**CONTRACT INTERPRETATION – WAIVER OF SUBROGATION – PUBLIC POLICY**

A requirement in a general contract to include a waiver of subrogation in all subcontracts does not automatically result in a project-wide waiver of subrogation.

Circuit Court for Baltimore City
Case No. 24-C-21-004794
Argued: May 6, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 31

September Term, 2023

_____

LITHKO CONTRACTING, LLC, ET AL.

v.

XL INSURANCE AMERICA, INC.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Hotten, Michele D. (Senior
    Justice, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: July 15, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Under the doctrine of subrogation, a party (the subrogee) who pays the debt or loss of another (the subrogor) may assert the subrogor's rights against third parties with respect to the debt or loss. As applied in the insurance context, an insurer who pays losses incurred by its insured can generally proceed by subrogation to assert its insured's rights against any other party responsible for the losses. In doing so, the insurer stands in the shoes of the insured, with rights only as great as those of the insured. As a result, an insurer's right to pursue subrogation against third parties can be contractually waived by an insured's waiver of the right to pursue claims against those third parties. Maryland generally recognizes and enforces such waivers. In this appeal, we explore whether a tenant who contracted for the construction and lease of a large warehouse facility waived its insurer's right to seek subrogation from subcontractors who worked on the project. The answer will turn on the specific terms of the relevant contractual provisions.

The players relevant to this appeal are: (1) non-party Amazon.com.dedc, LLC, a subsidiary of Amazon and the warehouse tenant ("Amazon"); (2) non-party Duke Baltimore LLC ("Duke"), which contracted with Amazon to construct a warehouse in Baltimore City, act as the general contractor for that project, and lease the warehouse to Amazon;[1] (3) the petitioners, four subcontractors that contracted with Duke to help

---

[1] The contracting party with the subcontractors was Duke Realty Limited Partnership, an affiliate of Duke Baltimore LLC. The parties to this case originally disputed the significance of the distinction between the two Duke entities, however, "XL ultimately conceded that it [was] not relevant to the present appeal." *XL Ins. Am., Inc. v. Lithko Contracting, LLC*, No. 0316, Sept. Term 2022, 2023 WL 6784245, at *1 n.4 (Md. App. Ct. Oct. 13, 2023). Before this Court, the parties have treated the two entities as one

construct the warehouse (the "Subcontractors"); and (4) the respondent, XL Insurance America ("XL"), which, as Amazon's insurer, indemnified Amazon for certain losses incurred at the warehouse.

XL contends that Amazon's losses were caused by the Subcontractors' negligence, and it brought this subrogation action against the Subcontractors to recover the amount it paid Amazon. The issue before us is whether Amazon waived XL's right to pursue subrogation claims against the Subcontractors through: (1) a waiver of subrogation in the contract that Amazon entered with Duke; (2) the requirement in that contract that the subcontracts include waivers of subrogation; and (3) the waiver of subrogation provision that was included in each of the subcontracts between Duke and the Subcontractors.

Applying the objective theory of contract interpretation, we hold that Amazon did not waive subrogation against the Subcontractors through the waiver provision in its contract with Duke. The Subcontractors are neither parties to nor intended third-party beneficiaries of the subrogation waiver in that contract. We also reject the Subcontractors' invitation to hold that a project-wide waiver of subrogation arises whenever a general contract requires the inclusion of subrogation waivers in subcontracts, without regard to the terms of the required waivers. Parties are free to contract for project-wide waivers of subrogation, narrower waivers, or even for no waivers.

_____

and the same. Accordingly, for purposes of this appeal, we will use "Duke" to refer to both entities without distinguishing between them.

However, we also hold that the waivers of subrogation that Amazon and Duke contracted to include in the subcontracts are ambiguous, and that it is therefore appropriate to permit the parties to this litigation to introduce extrinsic evidence concerning whether the parties to the relevant contractual documents intended that Amazon waive subrogation against the Subcontractors. We will therefore affirm the judgment of the Appellate Court of Maryland, which reversed the Circuit Court for Baltimore City's award of summary judgment to the Subcontractors. *See XL Ins. Am., Inc. v. Lithko Contracting, LLC*, No. 0316, Sept. Term 2022, 2023 WL 6784245, at *7-12 (Md. App. Ct. Oct. 13, 2023). We will remand this case to the Circuit Court for Baltimore City for further proceedings consistent with this opinion.

## BACKGROUND

### A. Subrogation

Under the doctrine of subrogation, "an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person." *Gables Constr., Inc. v. Red Coats, Inc.*, 468 Md. 632, 654 n.16 (2020) (quoting *Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 412 (1989)). Thus, an insurer (the subrogee) who compensates its insured (the subrogor) for a loss caused by a third party may step into the shoes of the insured to seek recovery from the third party. *See Gables Constr.*, 468 Md. at 654 n.16. In doing so, the insurer's rights "are equal to, but no greater than, those of the insured." *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 318 (2010) (quoting Robert E. Keeton & Alan I. Widiss, *Insurance Law: A Guide to*

3

*Fundamental Principles, Legal Doctrines, and Commercial Practices* § 3.10, at 219 (1988)). Subrogation may be contractually waived by the insured, which is common practice in construction projects. *Gables Constr. Inc.*, 468 Md. at 655.

### B. Factual Background

#### 1. The Development Agreement

In March 2014, Amazon and Duke entered a general contract (the "Development Agreement") under which Duke agreed to construct a warehouse on land that it owned, and Amazon agreed to lease that warehouse from Duke. At the same time, Amazon and Duke signed the lease for Amazon's rental of the warehouse. The Development Agreement was incorporated into the lease. In both the Development Agreement and the lease, Duke is identified as the "Landlord" and Amazon is identified as the "Tenant."

The Development Agreement contemplates two categories of construction at the warehouse: (1) the "Landlord Improvements," which encompassed the warehouse itself and other improvements to be made by Duke; and (2) the "Tenant Improvements," which were to be made by Amazon to facilitate its use of the property as a warehouse and distribution center. Under the terms of the Development Agreement, Duke was to serve as the general contractor for the "Project," which was defined to encompass only the real property on which the warehouse was to be built and the Landlord Improvements; and Amazon was to hire its own contractors for the Tenant Improvements.

The present dispute centers on two different contractual waivers of subrogation. The first is contained in § 12.4 of the Development Agreement and the second appears both

4

in § 4.3 of Exhibit I to the Development Agreement and in Attachment 1 to each of the subcontracts.

### 2. Article 12 of the Development Agreement

Article 12 of the Development Agreement includes provisions related to insurance requirements, indemnities, and waiver of subrogation. Section 12.1 requires Duke to obtain and maintain various types of insurance including, among others, commercial general liability insurance, professional liability insurance, and builder's risk insurance.[2] It also requires Duke to name Amazon (but not any subcontractors) as an additional insured on most of those policies. Section 12.2 contains additional provisions related to Duke's obligation to procure insurance.

Section 12.3 contains broad mutual indemnities under which Duke and Amazon agreed to indemnify one another, as well as each other's "affiliates and their agents, servants, directors, officers and employees," (but not contractors or subcontractors), for losses resulting from (1) third-party claims alleging injuries connected to the Project, and (2) acts or omissions of the other or the other's "agents, contractors, subcontractors, servants, employees, licensees or invitees," associated with their respective improvements

---

[2] Builder's risk insurance typically "provides first-party coverage for structures undergoing construction or major renovation," and is usually designed to address the specific risks associated with buildings under construction, as opposed to completed buildings. *Construction Insurance*: *A Guide for Attorneys and Other Professionals* 243 (Stephen D. Palley et al., eds., 2011).

on the property. Those broad indemnity provisions are then made "subject to" the narrower waiver of subrogation in § 12.4, which we will discuss in detail below.

### 3. *Exhibit I to the Development Agreement*

The Development Agreement required Duke to hire subcontractors to help build the warehouse and, pursuant to § 3.2, to include "the provisions set out in Exhibit I, as applicable[,]"[3] in its subcontracts. Exhibit I, titled "TERMS OF PROFESSIONAL SERVICE CONTRACT," includes a variety of provisions on different subjects. Section 2, for example, provides Amazon, identified as "Tenant," with a broad "right to participate in all material phases of the Project," including the right, "in its sole discretion, [to] assume and perform all rights and obligations of [Duke] under the Contract Documents," "the right to review and approve, in Tenant's reasonable discretion, the Agreement," and the right to "approve any changes to the Contract Documents[.]"

As relevant here, in § 4 of Exhibit I, "the parties" agreed to indemnify, defend, and hold harmless Amazon and its officers, employees, agents, contractors and affiliates from claims arising from activities at the Project for which Amazon is not at fault.[4] Paragraph

---

[3] Section 3.2 expressly required Duke to include the provisions of Exhibit I only in its contracts with "the Architect, the Civil Engineer and the Geotechnical Consultant regarding this Project[.]" The parties agree that Duke was required to include those provisions in its subcontracts with each of the Subcontractors. For purposes of this opinion, we are accepting that premise. We offer no opinion concerning that interpretation of the Development Agreement.

[4] Paragraph 4.2 identifies a separate indemnification provision to be included in the subcontract with "the Architect."

4.3 then provides a subrogation waiver, which is similar to, but, as we will discuss below, materially different from, the waiver in § 12.4 of the Development Agreement.

### 4. The Subcontracts

Four Subcontractors remain in this case: Ira G. Steffy & Son, Inc; ECS Mid-Atlantic, LLC; LJB Inc.; and Lithko Contracting, LLC.[5] Each entered into a subcontract with Duke.[6]

Each subcontract includes an Attachment 1 that contains the relevant provisions from Exhibit I to the Development Agreement. In each subcontract, Attachment 1 is labeled "STATE CHANGES TO THE CONTRACT DOCUMENTS (MARYLAND)." Each subcontract states that the provisions of Attachment 1 "modify, add to and delete from the language of this Agreement[,]" and that the provisions of Attachment 1 control in the case of any inconsistencies. Other than changes in labels, titles, and the numbering of some sections, the relevant provisions of Attachment 1 in each of the subcontracts are

---

[5] According to the complaint, Ira G. Steffy performed "structural steel services" for the Project; ECS (sometimes referred to in the record as Engineering Consulting Svc Ltd) provided inspection services; LJB provided "structural engineering services"; and Lithko (sometimes referred to in the record as Lithko Contracting, Inc.) fabricated and installed the panels constituting the exterior walls of the warehouse to which the steel roof joists were to be welded. As the parties have not called our attention to any significance to the different names used in the litigation documents and in the record, we do not address those differences.

[6] As discussed above in footnote 1, Duke Realty Limited Partnership is the entity that entered each of the subcontracts. The subcontracts identified Duke Baltimore LLC as "the Owner." Consistent with footnote 1, both entities are referred to as "Duke" for purposes of this appeal.

identical to the provisions of Exhibit I to the Development Agreement discussed and quoted above.

In addition to the subrogation waiver in Attachment 1, each subcontract also includes multiple other subrogation waivers, none of which mention Amazon. Each subcontract also requires the relevant subcontractor to purchase and maintain insurance for protection against claims arising from that subcontractor's work and operations and to name Duke as an additional insured on certain policies.

### 5. *The Underlying Loss*

Amazon first occupied the warehouse in September of 2014. According to the complaint, in November 2018, winds from a weather event allegedly caused a large section of the warehouse roof to detach and fly away from the building, which in turn led to the collapse of one of the walls. Amazon turned to its all risk insurer, XL, to cover losses to its Tenant Improvements. Although the record does not identify the amount of the loss, XL has claimed in briefing before this Court that its payments to Amazon exceeded $50 million.

### C. *Procedural Background*

XL brought this subrogation action in the Circuit Court for Baltimore City alleging that the Subcontractors' negligence was the cause of Amazon's losses and seeking to recover from the Subcontractors the amounts it had paid Amazon.[7] Two of the

---

[7] XL initially sued eight subcontractors. It stipulated to the dismissal of the claims against three of those subcontractors, and the circuit court entered judgment in favor of a

Subcontractors filed motions for summary judgment arguing that the waivers of subrogation in the Development Agreement and their subcontracts barred XL's claims against them. *XL Ins. Am., Inc.*, 2023 WL 6784245, at *2-3. The circuit court agreed that the Subcontractors could enforce the subrogation waivers against Amazon, and thus against XL, based on its conclusion that "when reading the development agreement in concert with the lease agreement and the subcontracts . . . the [Subcontractors] are intended beneficiaries of the subrogation waiver." The court therefore granted summary judgment in favor of the Subcontractors.[8] In coming to that conclusion, the court did not consider, nor did any of the parties offer, any extrinsic evidence of the subjective intent of the parties to the Development Agreement or the subcontracts concerning the scope of the waivers of subrogation.

In a well-reasoned unreported opinion, the Appellate Court reversed. *XL Ins. Am., Inc.*, 2023 WL 6784245, at *12. The court first concluded that the unambiguous language of the subrogation waiver in § 12.4 of the Development Agreement was limited to Amazon and Duke, the only parties to that agreement, and provided no rights to the Subcontractors. *Id.* at *8-9. The court also rejected the Subcontractors' argument that they could enforce

_____

fourth on the ground that it was not a party to the contracts. The Appellate Court affirmed the judgment with respect to the fourth subcontractor, *XL Ins. Am., Inc.*, 2023 WL 6784245, at *12, and XL has not pursued that issue further in this Court. Accordingly, we limit our discussion to the four remaining Subcontractors.

[8] Though only two of the Subcontractors initially moved for summary judgment, the parties agreed that the court's ruling would apply equally to XL's claims against the remaining Subcontractors. As a result, the parties agreed to the entry of an Agreed Order applying the court's summary judgment ruling to the remaining Subcontractors.

9

the waivers of subrogation in their subcontracts against Amazon, concluding that Amazon was not a party to those agreements and that "a reasonable person in the position of the parties reading th[e] subcontract for its plain meaning would necessarily conclude that the only parties to it are Duke and [the subcontractor]." *Id.* at \*10 (internal quotation marks omitted). The Appellate Court also rejected the Subcontractors' contention that Amazon was a party to the subcontracts by virtue of the control it exercised over those agreements and the rights it reserved for itself. *Id.*

The Subcontractors then petitioned this Court for a writ of certiorari, which we granted. *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 486 Md. 342 (2024).

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2-501(a). A fact is material if it "will somehow affect the outcome of the case." *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 533 (2021) (quoting *Taylor v. NationsBank, N.A.*, 365 Md. 166, 173 (2001)). This Court reviews a circuit court's grant of summary judgment without deference. *Bd. of County Comm'rs of St. Mary's County v. Aiken*, 483 Md. 590, 616 (2023). In doing so, we come to an independent determination of whether, reviewing the record in the light most favorable to the nonmoving party and construing all reasonable inferences against the moving party, a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Id.*; *Gambrill v. Bd. of Educ.*

10

*of Dorchester County*, 481 Md. 274, 297 (2022). Our role in that undertaking is the same as the circuit court's, which is not to resolve factual disputes but merely to determine whether those disputes "exist and are sufficiently material to be tried." *Gambrill*, 481 Md. at 297. "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law" reviewed without deference. *Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7 (2014) (quoting *Towson Univ. v. Conte*, 384 Md. 68, 78 (2004)).

## II.    LEGAL BACKGROUND

### A.    *Principles of Contract Interpretation*

Maryland courts follow the objective theory of contract interpretation. *Tapestry, Inc. v. Factory Mut. Ins. Co.*, 482 Md. 223, 239 (2022). "Under that approach, unless the language of the contract is ambiguous, we interpret it based on what a reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation." *Id.* (quoting *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (internal quotation marks omitted)); *see also JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635 (1997) ("The test is what meaning a reasonably prudent layperson would attach to the term." (quoting *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 521-22 (1997))). Therefore, it is "the written language embodying the terms of an agreement [that] will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Tapestry*, 482 Md. at 239 (quoting *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015)).

11

We do not interpret contractual language in a vacuum. Instead, we interpret that language "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." *Credible Behav. Health*, 466 Md. at 394 (internal quotation marks omitted) (quoting *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 88 (2010)). Although providing relevant context may necessarily require consultation of evidence beyond the "four corners" of the contract itself,[9] it does not extend to extrinsic or parol evidence of the

---

[9] This Court has, in the past, sometimes stated that in the absence of ambiguity, its review of a contract is limited to the "'four corners' of the agreement." *Impac Mortg. Holdings, Inc.*, 474 Md. at 506 (quoting *Cochran v. Norkunas*, 398 Md. 1, 17 (2007)); *see also, e.g.*, *Smith v. Johns E. Co.*, 269 Md. 267, 276 (1973) (stating that the objective test "limits the Court to the 'four corners' of the contract" (quoting *Ruppert v. Cumberland Brewing Co.*, 269 Md. 56, 61 (1973)); *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660 (2006) (stating that "when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement"). In context, those statements were addressed to extrinsic evidence of the parties' subjective intent, such as documentation of their course of dealings in negotiating the contract at issue or other agreements, not to information about the context in which the contract at issue was entered. *See, e.g.*, *Ocean Petroleum, Co.*, 416 Md. at 86, 88 (noting both that a court looks to the "four corners" of an agreement and that contract provisions must be considered in context, which includes the facts and circumstances of the parties at the time of execution); *John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 326, 334 (2010) (stating that contract interpretation is limited to the "four corners" of an agreement and explaining that "extrinsic evidence" for consideration after finding of ambiguity could involve facts about party negotiations, such as which party proposed the form contract used and the other form contracts that were available); *Impac Mortg. Holdings, Inc.*, 474 Md. at 506, 534 & n.32 (stating that contract interpretation is limited to the four corners of the agreement and later explaining that "information on the context as to the type of contract or transaction can be informative," though the "particular subjective intent of the parties" is not part of that context absent a finding of ambiguity); *see also Calomiris v. Woods*, 353 Md. 425, 436 (1999) ("[W]hile evidence of prior intentions and negotiations of the parties is inadmissible, the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity.").

parties' subjective intent, such as evidence of the parties' negotiations. *Impac Mortg. Holdings, Inc.*, 474 Md. at 534 n.32. Such evidence may be considered only after a court first determines that the relevant contract language is ambiguous, which occurs when, viewing the plain language in its full context, "a reasonably prudent person could ascribe more than one reasonable meaning to it." *Credible Behav. Health*, 466 Md. at 394.

In interpreting the plain language of a contract in context, we attempt to construe the contract as a whole, interpreting "separate provisions harmoniously, so that, if possible, all of them may be given effect." *Id.* at 396 (quoting *Walker v. Dep't of Human Res.*, 379 Md. 407, 421 (2004)). Construing the contract as a whole requires that effect "'be given to each clause' to avoid 'an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'" *Id.* at 397 (quoting *Clancy v. King*, 405 Md. 541, 557 (2008)). We conduct our inquiry always in adherence to the "bedrock principle of contract interpretation" in Maryland that our courts "consistently 'strive to interpret contracts in accordance with common sense.'" *Id.* (quoting *Brethren Mut. Ins. Co. v. Buckley*, 437 Md. 332, 348 (2014)).

If, after conducting this plain language inquiry, the court finds that "a reasonably prudent person could ascribe more than one reasonable meaning to it," the contract is ambiguous. *Id.* at 394. The determination of ambiguity is context-dependent, as contract language that "is clear in one context may be ambiguous in another." *Id.* (quoting *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508 (1995)). If a court finds ambiguity, it "must consider

13

any extrinsic evidence [that] sheds light on the intentions of the parties at the time of the execution of the contract." *John L. Mattingly Constr. Co. v. Harford Underwriters Ins. Co.*, 415 Md. 313, 327 (2010) (quoting *Sy-Lene of Washington, Inc. v. Starwood Urb. Retail II, LLC*, 376 Md. 157, 167-68 (2003)). To be considered, extrinsic evidence must be admissible and "must demonstrate 'an intent made manifest, not a secret intent' at the time of contract formation." *Impac Mortg. Holdings, Inc.*, 474 Md. at 508 (quoting *Gov't Emps. Ins. Co. v. Coppage*, 240 Md. 17, 25-26 (1965)).

"As a general rule, parties are free to contract as they wish." *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 366 (2013) (quoting *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 76 (2004)). A court will invalidate a contractual provision that violates public policy, but "only to the extent of the conflict between the stated public policy and the contractual provision." *Id.* at 367 (quoting *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643 (1986)). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350 (1974)). Thus, absent "fraud, duress, mistake, or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement." *Weichert Co. of Md. v. Faust*, 419 Md. 306, 325 (2011) (quoting *Calomiris*, 353 Md. at 445).

14

### B.    *Intended Third-Party Beneficiaries*

At common law, only a bargaining party to a contract could bring an action to enforce its terms. *CX Reinsurance Co. Ltd. v. Johnson*, 481 Md. 472, 486 (2022). The law has since expanded to recognize the right of a third-party contract beneficiary to bring such an action "if the contract was intended for [the third party's] benefit and it . . . clearly appear[s] that the parties intended to recognize [the third party] as the primary party in interest and as privy to the promise." *Id.* at 486-87 (quoting *120 W. Fayette St., LLLP v. Mayor & City Council of Baltimore*, 426 Md. 14, 36 (2012)) (omission and second alteration in *120 W. Fayette St.*).

To be entitled to bring an action to enforce a contract as a third-party beneficiary, the third party must therefore be an intended, rather than an incidental, beneficiary of the contract. *Id.* at 486, 487-88. The "crucial fact" in assessing whether a third party is an intended beneficiary is "whether the pertinent provisions in the contract were 'inserted . . . to benefit' the third party." *Id.* at 487 (quoting *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 457 (2012)) (omission in *CR-RSC Tower I*); *see also Shillman v. Hobstetter*, 249 Md. 678, 688 (1968) ("In determining whether one is a[n intended third-party] beneficiary . . . the intention of the contract, revealed by its terms, in the light of the surrounding circumstances is the controlling determinative." (quoting *Hamilton & Spiegel, Inc. v. Bd. of Educ. of Montgomery County*, 233 Md. 196, 199 (1963))).

15

## III.    THE AGREEMENTS

With those principles in mind, we turn to the contractual provisions on which the Subcontractors base their claim that Amazon waived subrogation against them:  (1) § 12.4 of the Development Agreement; and (2) what we will refer to as the "Subcontract Waiver Clause" (or sometimes "the Clause"), which is both § 4.3 of Exhibit I to the Development Agreement and § 4.2 of Attachment 1 to each of the subcontracts.  As we will discuss, the Subcontractors rely on the Subcontract Waiver Clause to make three separate waiver arguments.  First, they contend that the Clause, as it appears in Exhibit I to the Development Agreement, replaces § 12.4 of that agreement and serves as the operative waiver of subrogation in the Development Agreement.  Second, they contend that even if the Clause is not incorporated into the Development Agreement as an operative provision, its plain language as it appears in the subcontracts waives subrogation on behalf of Amazon.  Third, the Subcontractors contend that, regardless of the specific terms of § 12.4 and the Subcontract Waiver Clause, we should hold that a project-wide waiver of subrogation is created whenever the parties to a general contract require that subrogation waivers be included in all subcontracts.  We will address each of those contentions at different points in our analysis.

### A.    *Section 12.4 of the Development Agreement*

Section 12.4, titled "Waiver of Subrogation," provides:

Notwithstanding any other provision of this Agreement, neither party shall be liable to the other party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Project or upon, or constituting a part of, the Project, which

16

loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries such insurance, recovers under such insurance, or self-insures the loss or damage). Said mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss of, or damage to, property of the parties hereto. This waiver applies whether or not the loss is due to the negligent acts or omissions of the Landlord or Tenant, or their respective officers, directors, employees, agents, contractors, or invitees. . . .

To understand the waiver in § 12.4, we turn first to its component parts. The first sentence contains three parts establishing the basic terms of the waiver. The first part— "Notwithstanding any other provision of this Agreement"—provides § 12.4 with a place of priority over any competing provision in the Development Agreement. The second part—"neither party shall be liable to the other party or to any insurance company (by way of subrogation or otherwise)"—establishes the "who" scope of the waiver, protecting both parties to the Development Agreement from claims of the other or "any insurance company." The third part establishes the "what" scope of the waiver, covering any loss or damage to property associated with the Project "that could be insured against under the ISO Causes of Loss-Special Form Coverage," including deductibles.[10]

The second and third sentences of § 12.4 clarify certain aspects of the applicability and scope of the waiver. The second sentence confirms that it is additive to, and does not limit or replace, any other waivers or releases in the Agreement. The third sentence

---

[10] For purposes of this appeal, the parties do not dispute that the losses at issue could have been insured against under the referenced special coverage form.

17

provides that the waiver between Amazon and Duke applies regardless of who bears the responsibility for the loss or damage as among the two of them and their "respective officers, directors, employees, agents, contractors, or invitees." In other words, Amazon's and Duke's mutual waivers of the ability to sue each other (or any insurer) apply not just to losses each might cause directly, but also to losses for which each might otherwise bear responsibility.

The waiver of subrogation in § 12.4 unambiguously protects just two parties, Amazon and Duke, and it protects them from claims only by the other or "any insurance company." Amazon and Duke are the only parties to the Development Agreement and the plain language of the waiver references only two parties, stating that "*neither* party shall be liable to the *other* party." (Emphasis added). The waiver's plain language thus provides no benefit to the Subcontractors.

The Subcontractors raise several arguments against this plain language interpretation of § 12.4. First, they contend that they are intended third-party beneficiaries of § 12.4. But § 12.4 lacks any indication that Amazon and Duke intended to benefit the Subcontractors by the waiver. *See CX Reinsurance*, 481 Md. at 487 (quoting *CR-RSC Tower I, LLC*, 429 Md. at 457). To the contrary, the waiver expressly runs only to the benefit of Amazon and Duke. Indeed, the only reference to subcontractors is in the third sentence, which establishes that the waivers running to the benefit of Amazon and Duke

18

apply even if the applicable loss or damage was caused by one of their respective contractors.[11]

Second, the Subcontractors argue that "party" in the phrase "neither party shall be liable to the other party" in § 12.4 includes them because it should be read to encompass two terms defined in § 12.3 (which defines the scope of indemnities): (1) "Tenant Parties," defined to encompass, collectively, "Tenant or any invitee, licensee, employee, director, officer, agent, servant, contractor or subcontractor of Tenant"; and (2) "Landlord Parties," defined to encompass, collectively, "Landlord or any invitee, licensee, employee, director, officer, agent, servant, *contractor or subcontractor* of Landlord [i.e., Duke]." (Emphasis added). Not only is that interpretation inconsistent with the plain language of § 12.4, but it would be strange for the parties to take the care to define those terms in one provision and fail to reference them in the very next provision on the same page of the agreement, if they intended to invoke the same meaning. Far from supporting the Subcontractors'

---

[11] Other provisions of Article 12 demonstrate that the parties took care in the terms they used. For example, § 12.1 requires Duke to name Amazon, but not any subcontractors, as a named insured on the policies it was required to maintain related to the Project. And § 12.3 lists separately the individuals and entities entitled to indemnification—Amazon, Duke, and their "affiliates and their agents, servants, directors, officers and employees"— and those for whose acts indemnification is available—Amazon, Duke, and their "agents, contractors, subcontractors, servants, employees, licensees or invitees." Section 12.3, reflecting a similar division as in § 12.4, thus does not include subcontractors as among those receiving the benefit of the indemnity, while providing Amazon and Duke with indemnity from the actions of each other's subcontractors. The parties appear to have been purposeful concerning the inclusion or exclusion of subcontractors in the various provisions of the Development Agreement.

argument, the use of "party" so close to the definition of broader, defined terms demonstrates that the parties intended to use the narrower term in § 12.4.[12]

Third, the Subcontractors contend that § 12.4 is of no effect because it was displaced by the Subcontract Waiver Clause, which became the operative waiver of subrogation between Amazon and Duke. Their argument relies on the following: (1) the Subcontract Waiver Clause is in Exhibit I to the Development Agreement; (2) Section 16.16 of the Development Agreement provides that "[a]ll recitals, *exhibits*, and schedules to this Agreement are incorporated herein by this reference" (emphasis added); and (3) Exhibit I states that it sets forth "[p]roject-specific changes to the Agreement" that "modify, add to and delete from the language of the Agreement and the other Contract Documents," and that the project-specific changes control over inconsistent "language of the Agreement." Thus, the Subcontractors argue, Exhibit I was incorporated into the Development Agreement and its terms replace those of § 12.4 to the extent they conflict.

The Subcontractors' argument misapprehends the role Exhibit I plays and the purpose for which it is "incorporated" into the Development Agreement. Exhibit I does not modify or alter any terms of the Development Agreement. As provided in § 3.2 of the

---

[12] The Subcontractors cite to *Haren & Laughlin Construction Co. v. Jayhawk Fire Sprinkler Co.*, 330 S.W.3d 596 (Mo. Ct. App. 2011), as support for this argument. It is not on point. In *Haren*, a provision of the general contract defined the term "Contractor Parties" to include subcontractors, and a separate provision stated that "the parties" waived subrogation. *Id.* at 600. Missouri's intermediate appellate court concluded that, in that context, "parties" included the "Contractor Parties." *Id.* Here, by contrast, the language of § 12.4 expressly contemplates only two parties to the waiver of subrogation.

20

Development Agreement, Exhibit I contains terms that Duke was required to include in its agreements with its subcontractors.[13] As reflected in its title, "TERMS OF PROFESSIONAL SERVICE CONTRACT," the role Exhibit I plays in the Development Agreement—and so the way in which it is incorporated into that agreement pursuant to § 16.16[14]—is to set forth mandatory terms for each subcontract, not to reallocate the risks and obligations between Amazon and Duke in the Development Agreement. When a contract incorporates other documents such that multiple documents form the single agreement, "the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 354 (2004). Here, that is accomplished by treating the provisions in Exhibit I, including the Subcontract Waiver Clause, as terms to govern the subcontracts, not as re-writing the Development Agreement.[15]

---

[13] The Subcontractors and XL present this case to us under the premise that "Professional Service Contracts," as used in § 3.2, refers to the subcontracts and the term "Professional Service Provider" in that provision refers to the subcontractors. For purposes of this opinion, we are accepting that premise. We offer no opinion concerning that interpretation of the Development Agreement.

[14] Exhibit I is thus "incorporated" into the Development Agreement to the same extent as if § 3.2, instead of requiring subcontracts to contain "the provisions set out in Exhibit I," had simply listed those provisions. In neither case do those terms morph from provisions required to go in subcontracts to provisions that supersede terms of the Development Agreement.

[15] The Subcontractors raise an additional argument that relies on a position XL took before the circuit court but from which it has retreated on appeal. In the circuit court, XL took the position that the reference to Amazon in the third sentence of the Subcontract Waiver Clause protected Amazon. If true, the Subcontractors argue, the reference to contractors of Duke in the third sentence of the substantially similar § 12.4 must necessarily

21

In sum, § 12.4 is the waiver of subrogation provision applicable to the Development Agreement and the unambiguous terms of that provision do not establish a waiver in favor of the Subcontractors as either parties to or intended third-party beneficiaries of that agreement.

## B.     *The Subcontract Waiver Clauses*

The Subcontractors contend that even if the Subcontract Waiver Clause does not replace § 12.4 in the Development Agreement, that Clause, as it appears in each of their subcontracts, still unambiguously evidences Amazon's intent to waive subrogation against them.  We disagree, although we conclude that the Clause is ambiguous.

The Subcontract Waiver Clause provides:

Notwithstanding any other provision of the Contract Documents, no party shall be liable to another party or to any insurance company (by way of subrogation or otherwise) for any loss of, or damage to, any of its property located within the Project or upon, or constituting a part of, the Project, which loss or damage arises from the perils that could be insured against under the ISO Causes of Loss-Special Form Coverage, including deductibles (whether or not the party suffering the loss or damage actually carries such insurance, recovers under such insurance, or self-insures the loss or damage).  Said mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in the Contract Documents with respect to any loss of, or damage to, property of the parties.  This waiver applies whether or not the loss is due to the negligent acts or omissions of a party or Tenant [i.e. Amazon], or their respective officers, directors, employees, agents, contractors, or invitees. . . .

---

protect the contractors.  The logical flaw in the Subcontractors' argument is that, as we will explain below, the third sentence of the Subcontract Waiver Clause does not protect Amazon, and no misstatement by XL to the contrary before the circuit court can change that.

This Clause bears many similarities to § 12.4 of the Development Agreement, although with important differences. The first sentence again contains three parts establishing the basic terms of the waiver. The first part—"Notwithstanding any other provision of the Contract Documents"—establishes a place of priority over any competing provision in any of the Contract Documents.[16] For purposes of this appeal, we accept that the undefined term "Contract Documents" includes the subcontracts and the Development Agreement.[17]

The second part—"*no* party shall be liable *to another party* or to any insurance company (by way of subrogation or otherwise)" (emphasis added)—establishes the "who" scope of the waiver. Unlike the comparable provision of § 12.4, which is limited to the two parties to that agreement ("*neither* party shall be liable to *the other* party"), the language in the Subcontract Waiver Clause contemplates that the waiver applies to more

---

[16] This reference to other documents also implies that the two parties to the subcontract, Duke and the relevant subcontractor, may also be parties to one or more other agreements in which there may be a risk allocation that differs from that contained in the Subcontract Waiver Clause. As discussed below, that lends additional credence to the notion that the word "parties" could potentially refer to parties that are not named within the four corners of the subcontract.

[17] Although the term "Contract Documents" is not defined in any of the agreements in the record, the parties agreed at oral argument that it encompasses at least the subcontracts and the Development Agreement. For purposes of this appeal, we accept that. We observe, however, that § 2.1 of Exhibit I suggests that the Development Agreement might not be encompassed within the defined term "Contract Documents," at least not for all purposes. That provision states that Amazon may "in its sole discretion, assume and perform all rights and obligations of Landlord/Owner under the Contract Documents." It is difficult to see how that provision could be applied to the Development Agreement, to which Amazon is the only party other than Duke. In Attachment 1 to each of the subcontracts, the same provision states that Amazon may "in its sole discretion, assume and perform all rights and obligations under the Contract Documents[.]"

23

than two parties.  Notably, however, it does not identify who, beyond the two parties to each of the subcontracts, those parties might be.  We will return to that point soon.  And the third part establishes the "what" scope of the waiver, covering any loss or damage to property associated with the Project "that could be insured against under the ISO Causes of Loss-Special Form Coverage," including deductibles.

As with § 12.4, the second and third sentences of the Subcontract Waiver Clause address certain aspects of the applicability and scope of the waiver.  The second sentence confirms that it is additive to, and does not limit or replace, any other waivers or releases in the Contract Documents.  The third sentence provides that the waiver applies regardless of who bears the responsibility for the loss or damage as among "a party or Tenant [i.e., Amazon]," or any of "their respective officers, directors, employees, agents, contractors or invitees."

In contrast to the clarity of § 12.4, we conclude that the Subcontract Waiver Clause is ambiguous concerning whether Amazon, by requiring that the Clause be included within all subcontracts, waived subrogation against the Subcontractors.[18]  The first sentence of the

---

[18] In the ordinary course, two parties to an agreement could not impose a waiver of subrogation on a third who is not a party to that agreement.  Here, Amazon is a non-party to the subcontracts.  Typically, that would preclude a determination that, within the subcontracts, Amazon waived subrogation rights in favor of the Subcontractors.  But Amazon is not just any non-party.  Here, Amazon seems to have dictated enough terms of the subcontracts, including the various and ambiguous uses of the terms "party" and "parties," and contracted through the Development Agreement for the inclusion of those terms in the subcontracts, that we cannot foreclose, on this record and as a matter of law, the possibility that Amazon is included as a subrogation-waiving party in this clause of the subcontract.

24

Clause, which establishes the basic terms of the waiver, plainly contemplates application to more than two parties. Since there are only two parties to each of the subcontracts, the language suggests that it applies to "parties" who are not parties to the subcontracts.[19] But nothing in the Clause or elsewhere in Exhibit I or in the subcontracts suggests what other parties may or may not be included. One possibility, advocated by the Subcontractors, is that the waiver covers all parties to any of the "Contract Documents," including the Development Agreement. However, as noted, none of the documents in the record identify what the Contract Documents are, much less who all the parties to them are.

Even more problematic for the Subcontractors, and a focus of XL's argument, is the third sentence of the Clause, which provides that the waiver applies regardless of whether the loss is caused by the negligence "of a party or Tenant." That sentence plainly implies that whoever else the term "party" might encompass, it does not include Amazon, the Tenant.[20] Yet that argument is also unsatisfying, as XL is unable to identify any reasonable

---

[19] Two other slight differences in the wording of § 12.4 and that of the Subcontract Waiver Clause may lend weight to the possibility that the parties intended the latter, unlike the former, to encompass parties other than the two parties to the contract in which they appear. In § 12.4 of the Development Agreement, the second sentence states that its provisions do not limit any other waiver in the Agreement concerning damage to "property of the parties *hereto*." (Emphasis added). Similarly, the final sentence of § 12.4 requires "each party *hereto*" to provide notice of the waiver, when necessary, to its insurers. (Emphasis added). The analogous sentences in the Subcontract Waiver Clause omit the word "hereto." It is unclear whether the parties intended the difference in language to have significance.

[20] As part of a provision that Amazon required to be made part of the subcontracts, for which Amazon reserved discretion to approve any changes, and as part of a Project that centers entirely on Amazon, it would seem to be unlikely that the drafters simply forgot

25

interpretation of "parties" to whom the waiver applies that includes more than the two parties to each subcontract but does not include Amazon.[21]

In sum: (1) the first sentence of the Subcontract Waiver Clause clearly contemplates more than two parties waiving their subrogation rights, without providing any way to identify which parties those might be and with no textual basis to omit Amazon as a possible party; but (2) the third sentence treats Amazon as a non-party for purposes of that section.[22]

Looking to other language in Attachment 1 to the subcontracts does not resolve this ambiguity. For example, § 2 of Attachment 1 provides Amazon with broad rights

---

that Amazon was already included as "a party" when they decided to include "or Tenant" after "a party" in the third sentence of the Clause.

[21] The use of the term "party" does not, on its own, provide much clarity in this context. The generic term "party" may encompass different groups depending on the context in which the word is used. In the context of contractual agreements, when the term is undefined, it typically refers to a signatory or bargaining party to the contract. *See, e.g.*, *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019) (using "parties" in the context of describing the intent of the signatories to the agreement); *Cochran v. Norkunas*, 398 Md. 1, 14 (2007) (using "parties" to refer the bargaining parties in describing the central tenet of mutual assent); *Klein v. Weiss*, 284 Md. 36, 63 (1978) (same). Yet, here, the language applying the waiver to more than just two "parties" suggests it extends beyond the two parties that signed each subcontract without providing any additional guidance.

[22] We observe that a finding that Amazon waived subrogation against Duke but not vis-à-vis the subcontractors would be consistent with the structure of the indemnities in the relevant agreements. Unlike in the Development Agreement, which contains mutual indemnities and mutual waivers of subrogation as between Duke and Amazon, each of the subcontracts, in language required by Exhibit I, requires "the parties" to indemnify Amazon—again implying that Amazon is not a "party" as the term is used in those agreements—but does not include or reflect any reciprocal indemnification from Amazon. In that context, it would perhaps not be surprising that Amazon would not waive subrogation against the Subcontractors.

26

concerning the Project and the Contract Documents, including the right to step into Duke's shoes.  If invoked with respect to a subcontract, that may presumably make Amazon a party to that subcontract.  On the other hand, § 3 of Attachment 1 uses language suggesting that there are only two parties to the Contract Documents, referencing a situation in which "any provision of the Contract Documents requires a party to notify *the other* party of a delay in or to the Project Schedule. . . ."  (Emphasis added).

Contradictory language in the Subcontract Waiver Clause that is not otherwise clarified by other contract language or by any context in the record before us renders the Clause ambiguous.  "If a contract provision is ambiguous, 'the narrow bounds of the objective approach give way,' and the court may consider extrinsic evidence to ascertain the mutual intent of the parties."[23]  *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 507 (2021) (quoting *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 394 (2019)).  Here, the record contains no extrinsic evidence.  Accordingly, unless we agree with the Subcontractors that we should impose a project-wide waiver of subrogation as a matter of public policy—the issue to which we turn next—this case must be remanded to the circuit

---

[23] In briefing, the Subcontractors contended that, if the Court were to find ambiguity in the language of Exhibit I, the waiver should be construed against the drafter, Amazon, and thus, against XL.  However, both parties agreed at oral argument that in the event of ambiguity, this case should be remanded to allow for discovery of extrinsic evidence.  We also observe that the Development Agreement, in § 16.18, provides that the parties to that agreement "have equal bargaining power, and intend the plain meaning of the provisions herein[,]" and further states that if ambiguity is found, "this Agreement shall not be resolved by any rule of interpretation providing for interpretation against the party who causes the uncertainty to exist or against the draftsman."

27

court to permit the parties to this litigation to introduce extrinsic evidence, if any, of the subjective intent of the parties to the Development Agreement in negotiating that agreement. In doing so, the court should "consider admissible evidence that illuminates the intentions of the parties at the time the contract was formed." *Impac Mortg. Holdings*, 474 Md. at 507. Importantly, "retrospective, subjective, and unexpressed views about the contract are not proper extrinsic evidence." *Id.* at 508.

### C. Public Policy

The Subcontractors' final argument that Amazon waived subrogation against them is that this Court should hold that a project-wide waiver of subrogation exists whenever a general construction contract, like the Development Agreement, requires that subcontracts include a waiver of subrogation. The Subcontractors ground their argument in public policy, rather than contract principles, pointing out that this Court and others have previously recognized public benefits of project-wide subrogation waivers and the risk-allocation schemes they facilitate.

We decline the Subcontractors' invitation to adopt a rule that would impose project-wide waivers of subrogation on parties who have not agreed to them and, indeed, have chosen to structure their contractual arrangements differently. Such a holding in this context would run afoul of the "general rule" that parties are "free to contract as they wish," *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 366 (2013) (quoting *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 76 (2004)), as well as the cardinal rule of contract

28

interpretation, which is to effectuate the intent of the parties, *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013).

To be sure, this Court has previously recognized the benefits of waivers of subrogation, especially in the construction context. *See Gables Constr., Inc. v. Red Coats, Inc.*, 468 Md. 632, 655 (2020). "As a matter of policy, subrogation waiver[s] encourage[ ] parties [to a construction contract] to anticipate risks and to procure insurance covering those risks and also facilitate[ ] and preserve[ ] economic relations and activity." *John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 319 (2010) (internal quotation marks and citation omitted) (quoting *Hartford Underwriters Ins. Co. v. Phoebus*, 187 Md. App. 668, 677 (2009) (alterations added in *Hartford Underwriters*)). The Subcontractors express concern that in the absence of project-wide subrogation waivers, subcontractors would have to pay higher premiums for liability insurance and all parties would potentially be subject to inefficient and lengthy litigation over responsibility for losses, ultimately resulting in higher construction costs. According to the Subcontractors, a project-wide subrogation waiver, combined with the procurement of builder's risk insurance to protect all parties from their own negligence, solves that problem by providing that "[t]he entire loss should be borne by the insurer which has accepted one premium covering the entire property."

The Subcontractors' arguments concerning the benefits of project-wide subrogation waivers favor enforcing such waivers when parties have agreed to them, as we have done previously. *See Gables Constr.*, 468 Md. at 656-57. Those arguments do not favor

29

imposing project-wide subrogation waivers on parties that have not agreed to them. *Cf. John L. Mattingly*, 415 Md. at 324, 333-34 (in insurer subrogation action against a contractor and a subcontractor, holding that ambiguity in the scope of a project-wide subrogation waiver precluded the grant of summary judgment to the contractor and subcontractor). While the Court may decline to enforce contract provisions on the grounds that they are against public policy, *Weichert Co. of Md. v. Faust*, 419 Md. 306, 325 (2011), the Court will not rewrite the contracts of these parties to impose a project-wide waiver of subrogation. Parties are generally free to contract as they wish, absent contrary public policy or the General Assembly legislating otherwise, "and it is the duty of the Courts so to construe [contracts], if possible, as to maintain them in their integrity and entirety." *Post v. Bregman*, 349 Md. 142, 169 (1998) (quoting *Md. Fertilizing & Mfg. Co. v. Newman*, 60 Md. 584, 588 (1883)).

The out-of-state cases on which the Subcontractors rely do not support their position here. In both *South Tippecanoe School Building Corp. v. Shambaugh & Son, Inc.*, 395 N.E.2d 320 (Ind. Ct. App. 1979) and *Home Insurance Co. v. Bauman*, 684 N.E.2d 828 (Ill. App. Ct. 1997), general contracts between a property owner and a general contractor: (1) required the owner to maintain property insurance covering the risk of fire to the construction project and to include the subcontractors as additional insureds; (2) included a waiver of subrogation between the owner and the general contractor; and (3) required the general contractor to include "similar waivers" of subrogation in the subcontracts. *See S. Tippecanoe*, 395 N.E.2d at 322-23; *Bauman*, 684 N.E.2d at 829-30. In those

30

circumstances, intermediate appellate courts in Indiana and Illinois gleaned a clear intent among the parties to shift the risk of loss of fire damage on the project to the insurance that the owner was required to procure on behalf of all project participants. *See S. Tippecanoe*, 395 N.E.2d at 328 ("[A] builder's risk insurer is not entitled to subrogate against one whose interests are insured even though the party's negligence may have occasioned the loss[.]"); *Bauman*, 684 N.E.2d at 831 (stating the same). Here, by contrast, the Development Agreement did not require Amazon to procure insurance to cover the entire project or to name subcontractors as insureds on the insurance it did procure; and the Development Agreement required Duke to include specific waivers of subrogation in the subcontracts, not "similar waivers" to the waiver in the Development Agreement. The circumstances that led the courts in *South Tippecanoe* and *Bauman* to infer an intent to create a project-wide waiver of subrogation are not present here.

In the same vein, the Subcontractors, citing *General Cigar Co. v. Lancaster Leaf Tobacco Co.*, 323 F. Supp. 931, 941 (D. Md. 1971), argue that "an express waiver is not needed in order to waive subrogation; all that is needed is an agreement to purchase insurance to cover a specified loss." But the Subcontractors have not identified, nor have we found, an agreement with them, or for which they are an intended beneficiary, that required Amazon to purchase insurance to cover the loss at issue.[24]

---

[24] The Development Agreement requires Amazon to "cause" the general contractor for its Tenant Improvements "to carry builder's risk insurance covering the Tenant Improvements at all times during the course of construction," or alternatively to "provide

The Court will not reformulate the contract here to waive subrogation against the Subcontractors if the parties did not agree to do so.[25]  Amazon and Duke were free to *not* require a project-wide waiver of subrogation, and if a review of extrinsic evidence shows that was their intent, the Court will not force such a waiver upon them.

**CONCLUSION**

In sum, the unambiguous language of § 12.4 of the Development Agreement reveals no intent to benefit the Subcontractors, and therefore they may not enforce Amazon's waiver of subrogation in that agreement against XL.  The language of the Subcontract Waiver Clause, however, is ambiguous, and extrinsic evidence might assist in determining

---

such coverage under its corporate property insurance policy."  The Development Agreement also states that the policy is required "[i]n addition to the insurance required by . . . Article 9" of the lease, which requires Amazon to procure all risk property insurance covering Amazon's property within the warehouse and some of its changes therein, among other insurance policies.  The Development Agreement does not require these policies to also cover the interests of the subcontractors hired for the Landlord Improvements.

[25] That project-wide waivers are not difficult to create is another factor weighing against the Subcontractors' argument that we should hold that Amazon and Duke established a project-wide waiver of subrogation even though the contractual provisions state otherwise.  The American Institute of Architects produces "the most widely used and generally accepted standard contract forms in use within the construction industry." *Gables Constr., Inc.*, 468 Md. at 652.  These forms typically provide that the owner and general contractor on the project "waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) any of their subcontractors, sub-subcontractors and employees[.]" *Id.* at 640; *see also John L. Mattingly*, 415 Md. at 321 (American Institute of Architects standard form contract subrogation waiver stated that the owner and the contractor "waive all rights against . . . each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss").  If Amazon and Duke had intended to establish a project-wide waiver of subrogation, straightforward form contract provisions identifying how to accomplish that were readily available to them.

whether the parties intended that waiver to cover claims by Amazon (and its insurers) against the Subcontractors. We therefore affirm the Appellate Court's decision reversing the circuit court's grant of summary judgment to the Subcontractors and remand to that court to remand this case to the Circuit Court for Baltimore City for further proceedings not inconsistent with this opinion.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; TWO THIRDS OF COSTS TO BE PAID BY THE PETITIONERS AND ONE THIRD TO BE PAID BY THE RESPONDENT.**

33